O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JANICE M. GRANT,                    )    NO. CV 08-01377-MAN
                                    )
                Plaintiff,          )
                                    )    MEMORANDUM OPINION
        v.                          )
                                    )    AND ORDER
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
                Defendant.          )
_____ )

        Plaintiff filed a Complaint on February 28, 2008, seeking review of
the denial by the Social Security Commissioner ("Commissioner") of
plaintiff's application for a period of disability ("POD") and
disability insurance benefits ("DIB").  The parties filed a Joint
Stipulation on March 21, 2008, in which:  plaintiff seeks an order
reversing the Commissioner's decision and awarding benefits or, in the
alternative, remanding the matter for the correction of legal errors;
and defendant seeks an order affirming the Commissioner's decision.  On
January 9, 2009, the parties consented to proceed before the undersigned
United States Magistrate Judge.  The Court has taken the parties' Joint
Stipulation under submission without oral argument.

### SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On March 31, 2005, plaintiff filed an application for a POD and DIB. (Administrative Record ("A.R.") 100-03.) Plaintiff alleges an inability to work since September 1, 2000, due to: left shoulder rotator cuff surgery; arthritis in her left hip, elbow, and knees; pre-insulin diabetes; nerve damage in her neck radiating down her left side to fingertips; hiatal hernia; and gastrointestinal reflux disease. (A.R. 59, 66, 100.) She has past relevant work experience as a travel agent.[1] (A.R. 28, 29.)

The Commissioner denied plaintiff's application initially (A.R. 59-63) and upon reconsideration (A.R. 66-70). On October 15, 2007, plaintiff, who was represented by counsel, testified at a hearing before Administrative Law Judge F. Keith Varni. ("ALJ"). (A.R. 630-70.) On November 1, 2007, the ALJ issued a decision that was partially favorable to plaintiff, finding her disabled from September 1, 2000, through October 26, 2005. (A.R. 19-30). Thereafter, the ALJ found that plaintiff experienced medical improvement related to her ability to work, and as of October 26, 2005, plaintiff was able to perform her past relevant work as a travel agent. (*Id.*) On December 10, 2007, plaintiff requested review of the ALJ's decision by the Appeals Council and submitted new evidence. (A.R. 7-14, 619-29.) On January 18, 2008, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (A.R. 3-6.)

---

[1]   Plaintiff's work history is as follows: from 1979, through 1992, she worked as a flight attendant; from 1995, through 1997, she worked as a travel agent; and from 1997, through 2000, she worked as an airline reservationist. (A.R. 117, 654.)

**SUMMARY OF ADMINISTRATIVE DECISION**

In his written decision, the ALJ found that plaintiff met the insured status requirements of the Social Security Act as of September 1, 2000, and plaintiff has not engaged in substantial gainful activity since September 1, 2000, her alleged disability onset date. (A.R. 22.) The ALJ further found that plaintiff suffers from "severe" medically determinable impairments "involving the musculoskeletal system, cardiovascular system from hypertension, and endocrine system from insulin dependent diabetes mellitus." (*Id.*)

The ALJ determined that, from September 1, 2000, through October 26, 2005, plaintiff did not have the residual functional capacity ("RFC") to perform even sedentary exertional work, *i.e.* plaintiff was "unable to complete an 8-hour work day or 40-hour work week due to her physical symptomology." (A.R. 23.) More specifically, the ALJ determined, based on the testimony of a vocational expert, that from September 1, 2000, through October 26, 2005, plaintiff was unable to perform her past relevant work as a travel agent, plaintiff's acquired job skills did not transfer to other occupations within her RFC, and there were no jobs that existed in significant numbers that she could have performed. (A.R. 28-29.) The ALJ concluded, therefore, that plaintiff was disabled, as defined by the Social Security Act, from September 1, 2000, through October 26, 2005. (A.R. 29.)

However, in reliance on the 2005 opinions of a consultative examiner, Warren David Yu, M.D., and a State Agency physician, A. Lizarraras, M.D., the ALJ found that plaintiff experienced medical

3

improvement and was capable of performing a limited range of light work.
(A.R. 23, 29.) Specifically, the ALJ found that, as of October 26, 2005:

> [Plaintiff] can lift and carry 20 pounds occasionally and 10
> pounds frequently.  She can stand and walk for 6 hours out of
> an 8-hour work day, and she can sit for 6 hours out of an 8
> hour work day.  She is limited to frequent pushing and
> pulling.  She cannot climb ladders, ropes, or scaffolds.  She
> can occasionally climb ramps and stairs, and she can
> occasionally balance, stoop, kneel, crouch, and crawl.  She is
> limited to frequent overhead reaching with the left upper
> extremity, and frequent handling and fingering with both upper
> extremities.

(A.R. 29.)

Based on the ALJ's RFC assessment and the testimony of a vocational
expert, the ALJ found that, beginning October 26, 2005, plaintiff was
capable of performing her past relevant work as a travel agent.  (A.R.
29.)  Accordingly, the ALJ concluded that plaintiff's disability ended
on October 26, 2005.  (A.R. 30.)

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's
decision to determine whether it is free from legal error and supported
by substantial evidence in the record as a whole.  Orn v. Astrue, 495
F.3d 625, 630 (9th Cir. 2007).  Substantial evidence is "'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citation omitted). The "evidence must be more than a mere scintilla but not necessarily a preponderance." Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003). While inferences from the record can constitute substantial evidence, only those "'reasonably drawn from the record'" will suffice. Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006)(citation omitted).

Although this Court cannot substitute its discretion for that of the Commissioner, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." Desrosiers v. Sec'y of Health and Human Servs., 846 F.2d 573, 576 (9th Cir. 1988); *see also* Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." Orn, 495 F.3d at 630; *see also* Connett, 340 F.3d at 874. The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006)(*quoting* Stout v.

5

Comm'r, 454 F.3d 1050, 1055-56 (9th Cir. 2006)); *see also* Burch, 400 F.3d at 679.

**DISCUSSION**

Plaintiff alleges the following three issues:  (1) whether the ALJ properly evaluated plaintiff's neck limitations; (2) whether the ALJ properly evaluated plaintiff's excess pain testimony; and (3) whether the ALJ properly evaluated the testimony of third party witness Giselle Shannon.  (Joint Stipulation ("Joint Stip.") at 7.)

**I.   The ALJ Failed To Evaluate Plaintiff's Neck Limitations Properly.**

Disability benefits cannot be terminated unless substantial evidence demonstrates medical improvement in the claimant's impairment, so that the claimant is able to engage in substantial gainful activity. *See* 42 U.S.C. § 423(f); Murray v. Heckler, 722 F.2d 499, 500 (9th Cir. 1983).  Medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled."  *See* 20 C.F.R. § 404.1594(b)(1) and (c)(1).

To determine whether there has been medical improvement, the Commissioner (or ALJ) compares the claimant's current condition with the claimant's condition on the last date that she was found disabled.  *See* 20 C.F.R. § 404.1594(b)(1), (b)(7), and (c)(1).  This comparison makes it necessary for both an ALJ and a reviewing court to review the evidence of a claimant's prior symptoms, signs, and laboratory findings.

This comparison also requires knowledge of the basis for the prior favorable decision, including the impairments found disabling and on what basis such impairments were found to be disabling.  If no medical improvement has occurred, the claimant's disability does not cease.  20 C.F.R. § 404.1594(a).

In assessing a claimant's RFC, the Social Security Administration's regulations favor "the opinion of a treating physician over non-treating physicians."  Orn, 495 F.3d at 631; see also Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998); 20 C.F.R. § 404.1527(d)(1)-(2).  Generally, a treating physician's opinion is given greater weight, because "'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'"  Magallanes v. Brown, 881 F.2d 747, 751 (9th Cir. 1989)(citation omitted).  If a treating physician's opinion is "well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).

"When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'"  Orn, 495 F.3d at 632.  However, if the examining physician "provides 'independent clinical findings that differ from the findings of the treating physician,' such findings are 'substantial evidence.'"  Id. (citation omitted); see also Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001)(consultative examiner's opinion constituted substantial evidence, because it relied on an independent examination of the

1   claimant).

2

3       In his written decision, the ALJ found that plaintiff was disabled

4   from September 1, 2000, through October 26, 2005. (A.R. 23.) The ALJ

5   briefly summarized the extensive medical opinion evidence and concluded

6   that:

7

8       [Plaintiff] has a severe impairment of the musculoskeletal

9       system, the cardiovascular system from hypertension, and the

10      endocrine system from insulin dependent diabetes mellitus.

11      Her impairments have never met or equaled a list[ing], but

12      because of the multiple surgeries, periods of conservative

13      care, and convalescence period, they prevented regular

14      attendance at a work station from the alleged onset date until

15      she was found by the orthopedic consultative examiner and by

16      the State Agency physicians to have regained the residual

17      functional capacity for a limited range of light work.  The

18      assessment of the State Agency physicians is adopted as the

19      residual functional capacity from that time to the present.

20

21  (A.R. 23.)

22

23      The ALJ's finding of disability from September 1, 2000, through

24  October 26, 2005, recognizes the multiple procedures and surgeries

25  plaintiff underwent for a host of musculoskeletal impairments.

26  Specifically, on November 20, 2000, plaintiff underwent a nerve

27  conduction study of her cervical-upper extremity region, which revealed

28  abnormalities consistent with an active lesion of the C6 nerve root on

8

her left side.  (A.R. 535.)  On December 4, 2000, an MRI of plaintiff's cervical spine revealed decreased disc height at C5-C6 with disc bulges at the C4-5 and C5-6 levels.  (A.R. 533-34.)  On November 15, 2002, another MRI of the cervical spine revealed severe left side foraminal narrowing secondary to bony osteophytes at C5-6 and mild left sided foraminal narrowing at C4-C5.  (A.R. 617-18.)  On December 9, 2002, an electromyographic examination of plaintiff's left upper extremities revealed mild chronic left C6 nerve root impingement and mild neuropathy at the left wrist.  (A.R. 573-74.)  On February 5, 2003, plaintiff underwent an anterior cervical discectomy with bone graft fusion, including plating at C5/C6 due to C5/C6 foraminal stenosis with osteophytes, herniated nucleus pulposis with degenerative disc disease, and cervical radiculopathy, left greater than right.  (A.R. 484-88.) Plaintiff's neck surgery was not 100 percent successful as evidenced by plaintiff's pain testimony (discussed *infra*) and referral to William L. Wilson, M.D., a pain management specialist.[2]  (A.R. 521-25.)

Post-cervical discectomy, on November 11, 2003, plaintiff was

---

[2]    In addition to the 2003 cervical discectomy, plaintiff has undergone numerous surgeries on her upper extremities:  on June 22, 2001, plaintiff underwent left shoulder surgery consisting of arthroscopy with subacromial decompression for impingement syndrome of the rotator cuff (A.R. 23, 355); on March 22, 2002, plaintiff underwent a repeat left shoulder arthroscopy with subacromial decompression for repair of a torn rotator cuff and Mumford procedure (resection of the distal clavical) (A.R. 23, 387); on January 9, 2004, plaintiff underwent a third left shoulder surgery for removal of a suture from the previous surgery, arthroscopy, subacromial decompression, and manipulation due to adhesive capsulitis (A.R. 24, 582); and on May 2, 2007, plaintiff underwent right shoulder surgery for removal of an intramuscle lipoma (A.R. 200, 205, 229).

examined by Carl D. Maguire, M.D.[3]  (A.R. 474-81.)  Dr. Maguire opined, *inter alia*, that plaintiff "should not be required to perform activities which would require repetitive flexion, extension, or rotation of the cervical spine." (A.R. 479.)  On December 23, 2003, plaintiff was seen by Louis C. Towne, M.D., her primary care physician with whom she treated regularly beginning in March 2001, who declared plaintiff's post-surgical neck impairment *permanent and stationary* and opined, *inter alia*, that plaintiff should "avoid any repetitive bending or twisting about the cervical spine." (A.R. 379.)  On June 17, 2004, Dr. Maguire again examined plaintiff and opined that plaintiff "should not be asked to perform activities which would require repetitive motion or maintain[ing] the neck in the flexed or extended positions for extended periods of time."  (A.R. 570.)  These portions of the opinions of Drs. Towne and Maguire pertaining to plaintiff's neck limitations are at issue here.

Specifically, plaintiff contends that the ALJ failed to address properly the opinions of Drs. Towne and Maguire regarding plaintiff's neck limitations. (Joint Stip. at 8.)  Plaintiff further contends that the ALJ erred in relying on the opinions of Dr. Yu, a consultative examiner, and Dr. Lizarraras, a State Agency physician, to find that plaintiff was medically improved as of October 26, 2005, because neither Dr. Yu nor Dr. Lizarraras addressed plaintiff's neck limitations in assessing her RFC. (Joint Stip. at 9.)  For the reasons detailed below,

[3]   Dr. Maguire was the qualified medical examiner who evaluated plaintiff on several occasions, from February 2002, through June 2004, in connection with her worker's compensation claim, which arose from injuries sustained to her upper extremities on June 26, 2000. (A.R. 560.)

10

the Court agrees.

Both Drs. Towne and Maguire examined plaintiff on several occasions, opined as to her work restrictions, and specifically addressed her neck limitations. (A.R. 379, 479, 570.)  Contrary to the ALJ's assertion that the opinions of Drs. Towne and Maguire are "generally consistent" with the ALJ's RFC finding, the ALJ's RFC assessment does not take into account *any* neck limitations plaintiff may have.  (A.R. 25.)  While the ALJ's summary of the medical evidence is generally accurate, the ALJ did not specifically address the portions of the opinions of Drs. Towne and Maguire that pertained to plaintiff's neck limitations as detailed above.  Although the ALJ found that plaintiff's condition had improved sufficiently, as of October 26, 2005, to permit her to return to work, he failed to address the post-surgical, residual neck limitations found by both Drs. Towne and Maguire.  The ALJ was required either to give specific and legitimate reasons for rejecting these neck limitations or to explain how there had been medical improvement in plaintiff's neck condition after October 26, 2005.  The ALJ's failure to do so constitutes error.  (A.R. 23-26.)

The Court notes that, in an August 16, 2005 report, consultative examiner Dr. Yu, on whom the ALJ relied, opined that plaintiff was able to "sit, stand or walk for up to six hours in an eight-hour day. [She] should occasionally be allowed to pick up 20 pounds and frequently 10 pounds. [She] should have frequent use of the upper extremities, but only occasional use overhead with the left upper extremity." (A.R. 256.)  Critically, Dr. Yu's RFC opinion does not discuss any neck limitations, despite the fact that his objective findings regarding

11

plaintiff's neck impairment are similar to those of Drs. Towne and Maguire. (*See*, *e.g.*, A.R. 254-55 – Dr. Yu's findings that plaintiff's range of motion of the cervical and thoracolumbar spine was limited with tenderness in both areas; generalized myofascial tenderness in the upper extremities, atrophy of the proximal deltoid of the left shoulder, and residual impingement signs.)   Further, in an October 26, 2005 assessment, State Agency review physician Dr. Lizarraras, on whom the ALJ also relied, opined that plaintiff was able to:  lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk for up to six hours in an eight hour workday; push and/or pull frequently with the left upper extremity; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally reach overhead with the left upper extremity; and frequently handle and finger with the right upper extremity.   (A.R. 244-52.)   However, this assessment, like Dr. Yu's assessment, does not address plaintiff's neck impairment or incorporate any functional limitations arising from the objective findings regarding plaintiff's neck.

     The ALJ cannot, as he appears to have done here, implicitly reject the functional limitations arising from plaintiff's neck impairment, objective medical evidence of which was found by all treating and examining physicians, in favor of the RFC assessments established by Drs. Yu and Lizarraras, which do not include any neck restrictions, without giving specific and legitimate reasons for doing so. Accordingly, the ALJ's RFC assessment is inconsistent with the objective medical evidence that plaintiff has significant neck limitations, which the ALJ must address now in this medical improvement case.  On remand, the ALJ should re-assess his RFC finding and pay particular attention to

the extent to which, if at all, plaintiff's neck impairment may be disabling and/or has improved since October 26, 2005.

**II.  The ALJ Failed To Provide The Requisite Clear And Convincing Reasons For Rejecting Plaintiff's Subjective Pain Testimony.**

Plaintiff alleges that the ALJ erred in his consideration of plaintiff's subjective symptom testimony. (Joint Stip. at 16-22.)  For the reasons set forth below, the Court agrees.

Once a disability claimant produces objective evidence of an underlying physical impairment that is reasonably likely to be the source of her subjective symptom(s), all subjective testimony as to the severity of the symptoms must be considered.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 2001)(*en banc*); *see also* 20 C.F.R. § 404.1529(a) (explaining how pain and other symptoms are evaluated).  "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."  Robbins, 466 F.3d at 883.  Further, an ALJ may not rely solely on the absence of objective medical evidence supporting the *degree* of pain alleged as a basis for finding that a plaintiff's testimony regarding subjective symptoms is not credible.  Fair v. Bowen, 885 F.2d 597, 601-02 (9th Cir. 1989); Stewart v. Sullivan, 881 F.2d 740, 743-44 (9th Cir. 1989).

Both in her filings with the Commissioner and in her testimony,

13

1  plaintiff described various subjective symptoms from which she claims to
2  suffer.  With respect her neck pain, plaintiff testified that:

4          it started out with a cervical strain and a herniated disk
5          [*sic*], and C5 and 6.  This led to a surgery to try to correct
6          it and the pain, and now it's a cervical fusion after the
7          surgery.  I was left with a fusion and a compression plate and
8          screws in my neck.  I still have severe pain today despite the
9          surgery, and this type of pain it leaves me with a very
10         limited mobility and pain especially when I bend my neck down,
11         which would make it difficult to work at a desk, because
12         bending down it's -- my neck no longer flexes in a natural
13         fashion so I have to force it down, and that causes pain.  Now
14         with the fusion, I also have difficulty extending my neck
15         which happens when I reach for objects, so whether that be at
16         a desk or anywhere else extending my neck causes pain.  I also
17         -- I have difficulty rotating my neck or looking side to side.
18         Now this makes it difficult to drive.  I avoid driving due to
19         fear of causing an accident, and I will only drive if no one
20         else is around to take me.  Right now, I have a friend that
21         does most of the driving.

23 (A.R. 634.)  Plaintiff testified that, as a result of her neck
24 impairment, "it's difficult to see behind [her], so that makes it
25 difficult to drive as well as operate any machinery because [she] ha[s]
26 to turn [her] entire body around to see behind [her]."  (A.R. 635.)

28         Plaintiff also testified that she wakes up four to five times a

14

night because her "neck is so stiff and painful even sleeping medication does not help." (A.R. 635.)  She further testified that she wakes up with headaches every morning due to her "throbbing" neck pain.  (*Id.*)  Plaintiff testified that the pain in her neck is a ten on a scale of one to ten, and that the pain radiates down her left arm, into her hand, and numbs her fourth and fifth digits, making it difficult to grasp objects with her left hand.  (A.R. 636.)  Plaintiff stated that it is mainly her neck pain that limits her ability to sit for more than 15 minutes in a desk-type position, especially if she has to bend her head down while sitting.  (A.R. 645.)  Plaintiff testified that her neck pain is the most painful and limiting factor and for which she cannot get relief, because of drug interactions with her blood pressure and diabetes medications.[4]  (A.R. 647.)

Regarding the pain in her left shoulder, plaintiff testified that:

> it started out with a torn rotator cuff.  Now I've had three surgeries on the left shoulder in an attempt to fix the rotator cuff, but unfortunately all the surgeries were unsuccessful.  Today I still have an impingement.[5]  I have

---

[4]   At the hearing, plaintiff testified that she was taking the following medications: insulin and glucophage for diabetes; vasotec, tenormin, and catapres for high blood pressure; compazine, prevacid, and pepcid for nausea and vomiting as a result of gastroesophageal reflux disease; asprin for blood circulation; tylenol for pain; soma, a muscle relaxant, for pain; and restoril for sleep.  (A.R. 641-42.)

[5]   According to http://orthoinfo.aaos.org, "impingement is one of the most common causes of pain in the adult shoulder.  It results from pressure on the rotator cuff from part of the shoulder blade (scapula) as the arm is lifted."

crepitation.[6]   After the surgery I'm left with again very
limited rotation.   On my rotator cuff it's basically held
together right now with sutures and screws, so most of the
muscle in the trapezius was removed, and he just pieced it
back together.   Now with this particular problem it makes it
hard to again lift items.   I have weakness in my arm.   I -- as
far as reaching up that range of motion is definitely very
weak.    I have a -- I had a rotator cuff subacromial
decompression and a Mumford procedure, so basically that's a
resection of the entire shoulder and acromio-clavicular joint.
So I lost a great percentage of my ability for reaching,
lifting, pushing, pulling, and again strength in that left
shoulder.   From this I have a work-restriction from Dr. Towne
who is my primary orthopedic surgeon.   He advised before he
let me go no fine manipulation, typing, avoid any activities
requiring finger dexterity.

(A.R. 637.)


With respect to her right shoulder, plaintiff testified that, in
2006, she underwent surgery to remove a lipoma.[7]  (A.R. 638.)  Plaintiff
stated that her right shoulder it is very weak and painful to use.
(*Id.*)

---

[6]    According  to  http://www.mdadvice.com/library,  crepitation  is
defined as a "crackling sound when the tendon moves or is touched."

[7]    According to http://www.webmd.com, a lipoma is a "growth of fat
cells in a thin, fibrous capsule usually found just below the skin."

1    Plaintiff also testified that she has high blood pressure and
2    diabetes.  (A.R. 640.)  Her high blood pressure is between 160-180
3    systolic level when she wakes up in the morning and is resistant to
4    medication.  (*Id.*)  Plaintiff stated that when she can get her sugar
5    levels under 170, her blood pressure surges and causes her to have
6    irregular  heartbeats,  light-headedness,  dizziness,  and  loss  of
7    concentration.  (*Id.*)  She further stated that as a result of her
8    hypertension, she gets headaches, which are different from the neck
9    pain-related headaches.  (A.R. 641.)

10

11    As for her daily activities, plaintiff testified that she requires
12    assistance from her roommate with getting dressed, cooking meals,
13    driving to doctor's appointments, getting in and out of the bathtub, and
14    doing most household chores.  (A.R. 643-44.)  The farthest that she has
15    driven is about three miles, and "only if [she] ha[s] to."  (A.R. 652.)
16    Plaintiff testified that she attended Grossmont College after her first
17    shoulder surgery in 2001, and in 2002, but was forced to quit because
18    she could not sit up in class.  (A.R. 653.)

19

20    In his written decision, the ALJ found that plaintiff suffers from
21    "severe" impairments involving her musculoskeletal system, specifically
22    her cervical spine and shoulders, cardiovascular system, in the form of
23    hypertension, and the endocrine system from her insulin dependent
24    diabetes mellitus, all of which are medically determinable impairments
25    that reasonably could cause the subjective pain symptoms and attendant
26    limitations about which plaintiff complains.  (A.R. 23.)  However, the
27    ALJ rejected the credibility of plaintiff's testimony regarding the
28    nature and extent of her pain, because:  the ALJ construed plaintiff's

1  testimony as being "marked by considerable hyperbole"; there was "some
2  evidence of abuse of prescriptive pain medication"; and the record
3  contained evidence of plaintiff's ability to drive and attend college.
4  (A.R. 27-28.)  When examined in the light of the record as a whole,
5  these reasons does not withstand scrutiny.

7      First, the ALJ rejected plaintiff's excess pain and symptom
8  testimony because, in the ALJ's view, it was "marked by considerable
9  hyperbole." (A.R. 27.)  It is indisputable that plaintiff suffers from
10 numerous severe impairments, which can cause significant and
11 debilitating pain and discomfort.  There is no evidence in the record to
12 suggest that plaintiff has exaggerated the extent of her pain and
13 debilitating symptoms to any of her physicians, and the ALJ's conclusion
14 to the contrary is not a convincing reason to reject plaintiff's pain
15 testimony.  Bunnell, 947 F.2d at 347 (it is well-recognized that pain is
16 an inherently subjective phenomenon, which cannot be objectively
17 verified or measured and varies significantly among individuals).

19     The ALJ's second reason for discounting plaintiff's subjective
20 symptom testimony -- that there may be "some evidence of abuse of
21 prescriptive pain medication" -- is not a convincing basis upon which to
22 reject plaintiff's credibility.  (A.R. 27.)   It is not disputed that
23 plaintiff takes significant pain medication.  (A.R. 14, 113, 138, 237,
24 287, 511.)  However, the Court is not convinced that plaintiff's use of
25 prescribed narcotic medications rises to the level of "abuse," as the
26 ALJ asserts.  In support of his assertion, the ALJ stated that, in
27 August 2003, Dr. Towne indicated that he would not renew plaintiff's
28 prescription for Vicodin; however, the record shows that Dr. Towne

declined to give plaintiff another Vicodin prescription, because Dr. Maguire had already prescribed nonnarcotic medications and Dr. Towne wanted plaintiff to undergo a pain management evaluation, which plaintiff underwent with William Wilson, M.D., on September 22, 2003. (A.R. 521-24, 549.)   Indeed, a review of the record reveals that plaintiff has tried other avenues of relief, such as trigger point injections and facet block injections, both of which were unsuccessful at relieving her pain.  (A.R. 223, 561).

Finally, the ALJ rejected the credibility of plaintiff's testimony, because the ALJ found it inconsistent that plaintiff "drives" and "completed four years of college in February 2004," despite her complaints of debilitating pain. (A.R. 27.)   However, plaintiff testified that she only drives when she has to and that the farthest she has driven was three miles down the road.   (A.R. 653.)  Moreover, plaintiff's admission that she drives infrequently does not contradict her complaints of pain and debilitating limitations, particularly in view of her above-quoted testimony. With respect to plaintiff's schooling, there is no evidence in the record to indicate that plaintiff completed four years of college; rather the record reflects that she attempted to obtain her college degree by attending classes in 2001 and 2002, but was forced to quit because she could not sit up in class. (A.R. 653.)  There is no basis for finding that the activities cited by the ALJ, which appear to have been overstated, are easily transferable to the more grueling environment of the workplace, much less that they are inconsistent with and/or negate plaintiff's assertions as to her subjective pain symptoms. *See* Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998)(only if the level of activity was inconsistent with

claimant's claimed limitations would the activity have any bearing on claimant's credibility); <u>Cooper v. Bowen</u>, 815 F.2d 557, 561 (9th Cir. 1987)(disability claimant need not "vegetate in dark room" to be deemed eligible for benefits).

Accordingly, the ALJ's rejection of plaintiff's credibility without setting forth clear and convincing reasons for the rejection constitutes reversible error.  On remand, the ALJ must provide reasons, if they exist and are in accordance with the requisite legal standards, for discrediting plaintiff's pain testimony.

**III.  <u>The ALJ Failed To Evaluate The Testimony Of The Third Party Witness Properly</u>.**

In evaluating the credibility of a claimant's assertions of functional limitations, the Commissioner must consider lay witnesses' reported observations of the claimant.  <u>Stout</u>, 454 F.3d at 1053. "[F]riends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to [the claimant's] condition." <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918-19 (9th Cir. 1993); 20 C.F.R. § 404.1513(d)(4) ("we may also use evidence from other sources to show the severity of your impairment(s) . . . . Other sources include, but are not limited to . . . spouses, parents and other care-givers, siblings, other relatives, friends, neighbors, and clergy").  "If an ALJ disregards the testimony of a lay witness, the ALJ must provide reasons 'that are germane to each witness.'"  <u>Bruce v. Astrue</u>, 557 F.3d 1113, 1114 (9th Cir. 2009)(citation omitted).  Further, the reasons "germane to each witness" must be specific.  <u>Stout</u>, 454 F.3d

20

at 1054 (explaining that "the ALJ, not the district court, is required to provide specific reasons for rejecting lay testimony").

An ALJ may "properly discount lay testimony that conflict[s] with the available medical evidence" (Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984)), particularly, when, as in Vincent, "lay witnesses [are] making medical *diagnoses*," because "[s]uch medical diagnoses are beyond the competence of lay witnesses and therefore do not constitute competent evidence." Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)(original emphasis).   When, as here, however, a lay witness testifies about a claimant's symptoms, such testimony *is* competent evidence and cannot be disregarded without comment. *Id*.  Under Stout, 454 F.3d at 1055, "where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."

Plaintiff contends that the ALJ failed to address properly the testimony of plaintiff's roommate, Giselle Shannon. (Joint Stip. at 28-30, 31-32.)  At the hearing, Ms. Shannon testified that she has known plaintiff for ten years and has lived with her for approximately three years.  (A.R. 664-65.)  Ms. Shannon stated that she observes plaintiff in pain on a daily basis. (A.R. 665.)  She testified that she sleeps in the same room as plaintiff and observes plaintiff waking up in the middle of the night as a result of pain and/or high blood pressure. (A.R. 668.) Ms. Shannon testified that she assists plaintiff with basic personal care activities, such as getting dressed and putting on her

shoes, grocery shopping, cooking, and yard work. (A.R. 666-67.) She further testified that she drives plaintiff to the store, pharmacy, and doctors' appointments, because plaintiff has difficulty turning her neck. (A.R. 667-68.)

The entirety of the ALJ's rejection of Ms. Shannon's testimony is as follows:

> The testimony of [plaintiff] and her roommate establish no different conclusions.
>
> . . . .
>
> [Plaintiff's] roommate testified she has known [plaintiff] for ten years and has lived with her for three years. She said [plaintiff] has multiple complaints, cannot do anything, and is in bed all day. The witness supports [plaintiff's] allegations; hence, it is obvious motivations of friendship and personal financial gain are present and strong.

(A.R. 27-28.)

While it is true that Ms. Shannon's statements are consistent with plaintiff's assertions of pain and debilitating limitations, the fact that they are consistent with plaintiff's pain allegations is not necessarily indicative of "obvious motivations of friendship and personal financial gain," as the ALJ asserts. (A.R. 27.) This conclusion is unfounded, as there is no evidence in the record of

collusion between Ms. Shannon and plaintiff. Ms. Shannon is a competent witness in a position to observe plaintiff's symptoms and daily activities, and the reasons set forth by the ALJ for discrediting Ms. Shannon's testimony fall short of the "specific" and "germane" requirement contemplated by the above-cited authority.

Although the Commissioner, in his portion of the Joint Stipulation, has attempted to justify the ALJ's analysis by offering post-hoc rationale to support it (Joint Stip. at 30-31), a reviewing court cannot affirm the denial of benefits based on a reason not stated or a finding not made by the ALJ, and defendant's after-the-fact attempt to supply an acceptable basis for the ALJ's rejection of the testimony of plaintiff's roommate is unavailing. *See, e.g.,* Connett at 874 (noting that a reviewing court is "constrained to review the reasons the ALJ asserts," and an ALJ's decision cannot be affirmed on the basis of evidence he did not discuss); Pinto v. Massanari, 249 F.3d 840, 847-48 (9th Cir. 2001)(an agency decision cannot be affirmed based on a ground that the agency did not invoke in making its decision); *see also* Barbato v. Comm'r of Soc. Sec. Admin., 923 F. Supp. 1273, 1276 n.2 (C.D. Cal. 1996)(remand is appropriate when a decision does not adequately explain how a decision was reached, "[a]nd that is so even if [the Commissioner] can offer proper post hoc explanations for such unexplained conclusions," for "the Commissioner's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council")(citation omitted).

On remand, the ALJ must provide proper reasons, to the extent they exist, for rejecting Ms. Shannon's statements regarding her observations

of the nature and extent of plaintiff's alleged impairments and attendant limitations as discussed above, so that a reviewing court may know the basis for the ALJ's decision and have the ability to assess the propriety of that decision.

**IV.  <u>Remand Is Required</u>.**

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  *Id*. at 1179 ("the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings").  However, where there are outstanding issues that must be resolved before a determination of disability can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated, remand is appropriate.  *Id.*

Here, remand is appropriate to allow the ALJ an opportunity to remedy the above-mentioned deficiencies and errors.  *See, e.g.,* <u>Benecke v. Barnhart</u>, 379 F.3d 587, 593 (9th Cir. 2004)(remand for further proceedings is appropriate if enhancement of the record would be useful); <u>McAllister</u>, 888 F.2d at 603 (remand appropriate to remedy defects in the record).

///

///

**CONCLUSION**

Accordingly, for the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: September 30, 2009

_Margaret A. Nagle_
MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE

25